**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**MELVA SHUTTS FARRIS,**

     **Plaintiff,**

**vs.**                          **CIVIL ACTION NO. 2:17-CV-02051**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered March 30, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 12 and 13.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings to the extent she seeks remand (Document No. 12.), **DENY** Defendant's request to affirm the decision of the Commissioner (Document No. 13.); **REVERSE** the final decision of the Commissioner; and **REMAND** this matter back to the Commissioner

1

pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings as explained *infra*.

<u>**Procedural History**</u>

The Plaintiff, Melva Shutts Farris (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on June 4, 2013, alleging disability since April 22, 2013, because of "Addison's disease, depression, spinal stenosis (lower back), sciatica, steroid induced psychosis (given steroids for Addison's), suspicious glaucoma, diabetes insipidus, hypoparathyroidism, pituitary tumor surgery, Graves' disease, adult growth hormone." (Tr. at 177.) Her claim was initially denied on November 12, 2013 (Tr. at 93-97.) and again upon reconsideration on April 21, 2014. (Tr. at 99-101.) Thereafter, Claimant filed a written request for hearing on May 29, 2014. (Tr. at 102-103.) An administrative hearing was held on January 5, 2016 before the Honorable John T. Molleur, Administrative Law Judge ("ALJ"). (Tr. at 42-60.) On February 17, 2016, the ALJ entered an unfavorable decision. (Tr. at 21-41.) On March 30, 2016, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 8-9, 291-293.) The ALJ's decision became the final decision of the Commissioner on January 31, 2017 when the Appeals Council denied Claimant's Request. (Tr. at 1-7.)

On March 28, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 7 and 8.) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 12.), in response, the Commissioner filed a Brief in Support of Defendant's Decision (Document No. 13.), and Claimant filed her Reply. (Document No. 14.) Consequently,

this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 59 years old as of the alleged onset date, a "person of advanced age", and then changed age categories as a person "closely approaching retirement age" shortly after she filed her application for disability benefits. See 20 C.F.R. § 404.1563(e). (Tr. at 156.) Claimant has a Bachelor's Degree in Business Management and additional graduate course work. (Tr. at 49.) Claimant last worked in 2013 for the State of West Virginia at the Department of Health and Human Resources, having retired due to onset of Addison's disease and trouble taking steroids. (Tr. at 49-50.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not,

the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally,

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2017. (Tr. at 26, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of April 22, 2013. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: Addison's disease; diabetes insipidus; hypopituitarism; chronic kidney disease stage 1; hypertension; and degenerative disc disease. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 28, Finding No. 4.)

The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work "except she could perform climbing, bending, stooping, kneeling, crouching and crawling no more than occasionally. She could have no more than occasional exposure to extremes

of temperatures or vibration." (Tr. at 29, Finding No. 5.) At step four, the ALJ found Claimant was capable of performing her past relevant work as a human resources manager and a nursing home Medicaid evaluator and not precluded by Claimant's RFC. (Tr. at 34, Finding No. 6.) Finally, the ALJ determined Claimant had not been under a disability from April 22, 2013 through the date of the decision. (Tr. at 35, Finding No. 7.)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

Claimant argues that the ALJ erred in two main areas: the first is that he failed to adhere to the special deference standard when evaluating the opinion of Claimant's treating physician, Dr. Steven Milhoan. (Document No. 12 at 5-7.) Specifically, the ALJ neither explicitly weighed Dr. Milhoan's opinion, nor did he explain why he discounted his opinion concerning the sedating nature of Seroquel would result in Claimant's mental deficits; Seroquel was effective in controlling Claimant's psychotic symptoms from steroids. (<u>Id</u>. at 7-8.) Claimant contends that the ALJ could have solicited further information from Dr. Milhoan to explain his opinion since the ALJ found it insufficient, which is particularly necessary where the vocational expert testified that a person missing work as often as Claimant due to fatigue could not perform her past relevant work or any other work. (<u>Id</u>. at 8-9.) Without assigning Dr. Milhoan's opinion a weight, the ALJ did not provide good reasons for same as required under the Regulations, the result is an RFC assessment unsupported by substantial evidence. (<u>Id</u>. at 9-10.)

Next, Claimant asserts that the ALJ erred at step two when he found her mental impairments non-severe, as he did not consider the effects of her fatigue, depression or anxiety with respect to his RFC assessment. (<u>Id</u>. at 10-12.) Claimant argues this omission is not harmless, because if she were limited to unskilled work, Medical-Vocational Rule 201.06 would direct a

finding that she was disabled.

Claimant contends that the ALJ's decision is not supported by substantial evidence and asks this Court remand this matter for the correction of errors made below. (Id. at 12.)

In response, the Commissioner argues the ALJ's finding Claimant's mental impairment non-severe was supported by substantial evidence, and proceeded to perform the special technique finding mild to no limitations in all functional areas, but still accommodated her fatigue in the RFC by reducing her to sedentary work. (Document No. 13 at 12-15.) Additionally, the Commissioner asserts that the ALJ appropriately found that Claimant's sparse mental health treatment failed to demonstrate that her limitations precluded her from performing her past relevant skilled sedentary work. (Id. at 15.) The unambiguous medical evidence did not show that Claimant's alleged fatigue from Seroquel prevented her from working. (Id. at 15-16.) Because this evidence was not insufficient or inconsistent, the ALJ had no duty to order a psychological evaluation or to contact Dr. Milhoan for clarification; moreover, Claimant's own statements to her providers supported the ALJ's conclusion that fatigue did not significantly limit her capacity for work-related activities. (Id. at 17-18.) Lastly, the Commissioner adds that the Medical-Vocational Guidelines are inapplicable to this case because the ALJ determined at step four that Claimant was capable of performing her past relevant work. (Id. at 18, fn4.)

With respect to Dr. Milhoan's opinion, the Commissioner contends that the ALJ did not have to afford it any special deference; while contrary persuasive evidence is sufficient to show that a treating source opinion is not entitled to controlling weight, its inconsistency with the evidence of record is also a valid basis to accord less than controlling weight. (Id. at 18-19.) Dr. Milhoan provided a conclusory opinion, that Claimant is truly disabled, ostensibly due to the

sedating effect of Seroquel, which does not comport with the Regulations' definition of "medical opinion." (Id. at 19-20.) This was an administrative determination reserved solely for the Commissioner; further, the ALJ noted that Dr. Milhoan's opinion was not supported with any specific functional limitations or explanation as to how Claimant's fatigue from Seroquel would render her incapable of working. (Id. at 20.)

The Commissioner asks that the final decision be affirmed. (Id.)

Claimant replies that nowhere in his decision does the ALJ explain how Claimant was not limited to unskilled work due to the sedating effects of Seroquel because of her lack of mental health treatment, as it this is somehow an appropriate or effective method in alleviating side effects of medication. (Document No. 14 at 1-2.) Claimant asserts the RFC limitation to sedentary work is not an accommodation for her fatigue, where she would need to retain sufficient concentration and alertness to perform her prior skilled work. (Id. at 2.) Further, the Commissioner's argument is a *post hoc* analysis that was not evident in the ALJ's decision, and does not provide substantial evidence at step two. (Id.) Additionally, the ALJ's finding that despite her claims of fatigue, Claimant was capable of unskilled work does not provide substantial evidence that she was capable of her prior skilled work. (Id. at 3.) Finally, Claimant argues she did not take any of the Federal Register entries out of context, but the special deference standard remains applicable to treating source opinions that the ALJ failed to apply in this case. (Id.)

Claimant renews her request for remand. (Id. at 4.)

## The Relevant Evidence of Record[2]

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Medical Records:

In September 2008, Claimant was admitted to the hospital for steroid induced mania. (Tr. at 303.) She was treated with Seroquel that was titrated upwards from 50 mg to 300 mg that improved her condition allowing her to be discharged to home with instructions to continue Seroquel until her psychiatric symptoms stabilized. (Tr. at 304.)

On April 25, 2013, Claimant was admitted to the hospital for bronchitis and hyponatremia; Stevan J. Milhoan, M.D., prescribed steroid medication, which caused Claimant to hallucinate (Tr. at 389, 424-425, 427-428.) With discontinuation of the medication, her symptoms slowly corrected. (Tr. at 389.)

On April 27, 2013, Dr. Milhoan filled out a Physician's/Practitioner's Statement for the State of West Virginia, Claimant's employer, following her recent hospitalization for steroid-induced psychosis. (Tr. at 541.) Dr. Milhoan stated that Claimant would be unable to return to work because she needed steroid therapy but could not take steroids due to a history of steroid-induced psychosis. (Id.) However, Dr. Milhoan checked the block indicating that Claimant's condition would not permanently prevent her from performing her duties. (Id.)

On April 29, 2013, May 2, 2013, May 23, 2013, and September 19, 2013, Dr. Milhoan saw Claimant for follow-up care, at which time a review of systems was negative for fatigue. (Tr. at 529-532.)

On May 17, 2013, Frank L. Schwartz, M.D., an endocrinologist, saw Claimant following the episode of steroid-induced psychosis on referral from Dr. Milhoan. (Tr. at 389.) Claimant

endorsed anxiety, change in sleep pattern, and depression, but denied inability to concentrate. (Tr. at 391.) A mental status examination was normal. (Id.)

On June 5, 2013, Lance McCoy, M.D., performed a psychiatric evaluation upon referral from Dr. Milhoan. (Tr. at 435-437.) Claimant reported that she had multiple episodes of low-level depression that had never required inpatient psychiatric care. (Tr. at 435.) She also reported that her depression had been treated successfully as an outpatient. (Id.) She told Dr. McCoy that she had been hospitalized in 2008 for steroid-induced mania, and more recently for an episode of hallucinations/steroid-induced psychosis, following the use of Cortef 10 mg that resolved with the use of Xanax and discontinuation of Cortef. (Id.) She stated that she had been off work recently, although psychosis from the use of Cortef had improved. (Tr. at 436.) On mental status examination, Claimant denied hopelessness, helplessness, suicidal or homicidal ideation, and auditory or visual hallucinations. (Id.) She was alert, with good awareness of her surroundings and had good recall. (Id.) Her abstraction was intact, her general fund of information was adequate, and her insight and judgment were adequate. (Id.) Diagnoses included steroid-induced mania, by history; steroid-induced psychosis; depressive disorder NOS (not otherwise specified); and the current GAF of 65. (Tr. at 436-437.)

On August 22, 2013, Rammy S. Gold, M.D., a neurosurgeon, saw Claimant to discuss a recent MRI of the brain, which showed no significant change since August 2011. (Tr. at 500.) Claimant had recently been diagnosed with Addison's disease; Dr. Gold noted that she presented to the clinic "essentially asymptomatic." (Id.) Claimant complained of anxiety and difficulty sleeping but denied depression, suicidal ideation, or homicidal ideation. (Tr. at 503.) A mental status examination revealed that Claimant was awake, alert, and oriented. (Id.) Her speech

development was normal for her age, her comprehension was intact, and her communication ability was within normal limits. (Id.) Her attention and concentration abilities were normal as well. (Id.) A psychiatric evaluation revealed that Claimant's judgment and insight were intact, her mood was normal, and her affect was appropriate. (Tr. at 504.)

On July 8, 2013, LeeAnn Reed, PA-C, a physician's assistant associated with Westbrook Health Services, performed a psychiatric evaluation. (Tr. at 525-527.) Claimant complained of difficulty sleeping but denied auditory hallucinations. (Tr. at 525.) She reported that she had been depressed since 1989. (Id.) During a follow up visit on July 24, 2013, Claimant denied any depressive symptoms since restarting venlafaxine 75 mg. (Tr. at 523.) She reported that she was going to retire from her job, with her last day being July 31. (Id.) She told Ms. Reed that she had been keeping herself busy by writing newsletters for her husband, sending out letters, and preparing for a garage sale to help the Veteran's Museum, activities she found enjoyable. (Id.)

At another follow up visit on August 19, 2013, the only medication-related side effect was sialorrhea (hypersalivation) due to Abilify. (Tr. at 632.) On September 3, 2013, Claimant reported that she had been refinishing furniture to occupy her time now that she was retired. (Tr. at 519.) On September 17, 2013, Ms. Reed noted that Claimant began titrating up on Seroquel. (Tr. at 517.) Claimant reported that she was sleeping well and stated, "I feel normal, I'm much calmer, I feel like me." (Id.) Ms. Reed noted that Claimant was taking her steroids as prescribed; Claimant denied current depressive symptoms, and was enjoying retirement and doing craft projects with her son. (Id.) A mental status examination revealed that she was alert, oriented to person, place, and time, and cooperative. (Id.) Her affect was full and appropriate, her thought process/abstraction was goal directed, her associations were intact, she denied suicidal or homicidal ideation, and her insight

12

and judgment were fair. (Id.) Diagnoses included anxiety state not otherwise specified, drug-induced mental disorder not elsewhere classified, and dysthymic disorder. (Tr. at 518.)

In September 2013, Mirza Hamirani, M.D., a nephrologist, saw Claimant for follow-up care, at which time she denied tiredness or fatigue. (Tr. at 508.)

On October 1, 2013, Jessica Perini, M.D., an endocrinologist, saw Claimant for a second opinion regarding her diagnosis of Addison's disease. (Tr. at 583-586.) Claimant told Dr. Perini that she retired early because of the need to find a psychiatric medication that would work for her. (Tr. at 583.) Claimant had restarted GC (glucocorticoids) around September 1, 2013, and reported that Seroquel was helping with her hallucinations. (Id.) She complained of extreme fatigue. (Tr. at 584.)

On October 15, 2013, Ms. Reed saw Claimant for follow-up care, at which time she reported mild depressive symptoms. (Tr. at 626.) Although Claimant complained that she did not have the motivation to get up and do things, she acknowledged that she was able to get enjoyment out of things, her appetite and sleep were good, and she had started exercising two days a week at the gym. (Id.) Ms. Reed noted that Claimant was not manic, psychotic, suicidal or homicidal. (Id.) The only medication-related side effect she reported was inability to taste after using Saphris. (Id.) On November 12, 2013, Claimant reported mild depressive symptoms, but stated that she did not feel depressed, and was content to rest around the house. (Tr. at 624.) She planned to go to Tennessee to visit her daughter for the holidays. (Id.) She did not report medication-related side effects. (Id.)

On January 14, 2014, Claimant told Ms. Reed that she was having some daytime sedation, but had been able to travel to South Carolina and Tennessee for the holidays and enjoyed the trip;

she reported no other concerns or complaints. (Tr. at 622.) Ms. Reed reduced Quetiapine (Seroquel) to 300 mg at night due to daytime sedation. (Tr. at 623.) Less than one month later, on February 11, 2014, Claimant reported that she was "doing great"; decreasing Seroquel had allowed her to waken earlier, she had more energy, her appetite was good, and she denied depression, anxiety, or suicidal or homicidal ideation. (Tr. at 620.)

On March 4, 2014, Claimant returned to Dr. Milhoan to have him complete disability papers. (Tr. at 634.) She told Dr. Milhoan that Seroquel controlled her psychosis but caused profound fatigue. (Id.) She also told Dr. Milhoan that she could not concentrate on Seroquel. (Id.) Claimant denied anxiety, depression, memory loss, or suicidal ideation. (Id.) A neurologic examination revealed that she was alert and oriented x3 (to person, place, and time) with no impairment of recent or remote memory, and normal attention span and ability to concentrate. (Tr. at 636.) Dr. Milhoan concluded that Claimant must be on steroid to live due to her Addison's disease and that she "is incredibly agitated and has severe hallucinations." (Id.) Dr. Milhoan noted that Seroquel had successfully controlled Claimant's behavior changes, but that the drug was very sedating and was "our only choice" in treating her. (Id.) Dr. Milhoan noted that Claimant "is one of the most complex endocrinologic patients I have ever seen" and that "I completely support her application for disability and I believe Dr. F. Swartz feels as strongly as I do." (Id.)

The following day, March 5, 2014, Dr. Milhoan completed a Treating Physician or Direct Care Provider form for the Disability Determination Service. (Tr. at 638-640.) Dr. Milhoan reiterated that Claimant was taking Seroquel, which was very sedating and concluded, "she truly is disabled." (Tr. at 638.)

One day later, on March 6, 2014, Dr. Hamirani saw Claimant for follow-up care, at which

time she denied tiredness or fatigue. (Tr. at 699.)

On April 8, 2014, Ms. Reed saw Claimant for follow-up care, at which time Claimant reported that she was "doing well." (Tr. at 682.) Claimant reported some mild depression as well as worry about her son, otherwise she had no other concerns or complaints and denied any medication-related side effects. (Id.) On June 9, 2014, Ms. Reed noted that Claimant's mood was stable since her last visit, though she complained of significant weight gain and other side effects that she attributed to prednisone. (Tr. at 680.) Claimant denied any other medication-related side effects. (Id.)

On June 30, 2014, Dr. Schwartz saw Claimant for follow-up care. (Tr. at 641.) She complained of weight gain and increased bruising on prednisone. (Id.) Claimant also complained of fatigue, skin dryness, visual disturbances and hearing loss, constipation, muscle weakness, numbness, hair changes and depression. (Tr. at 644.) It was also noted that her depression was controlled on Seroquel, and that Claimant continued to see Ms. Reed at Westbrook. (Tr. at 644.) Claimant denied anxiety or a change in sleep pattern. (Id.)

On August 4, 2014, and September 24, 2014, Ms. Reed noted that Claimant denied medication-related side effects. (Tr. at 676, 678.)

On September 9, 2014, Dr. Hamirani saw Claimant for follow-up care, at which time she denied tiredness or fatigue. (Tr. at 692.) A psychiatric examination revealed that Claimant was oriented to time, place, and person, and that her mood, judgment, insight, and recent and remote memory were normal. (Tr. at 693.)

On December 17, 2014, Ms. Reed saw Claimant and she denied medication-related side effects. (Tr. at 719.)

15

On January 23, 2015, Dr. Milhoan once again documented no complaints of tiredness or fatigue, anxiety, or depression. (Tr. at 836.)

On February 11, 2015, Ms. Reed saw Claimant for follow-up care at which time she reported that she was "doing well" on her current medication regimen and denied medication-related side effects. (Tr. at 733.)

On March 10, 2015, and September 9, 2015, Dr. Hamirani saw Claimant for follow-up care, at which time she specifically denied tiredness or fatigue. (Tr. at 791, 795.)

On July 23, 2015, Dr. Milhoan saw Claimant for follow-up care. (Tr. at 830.) She denied tiredness or fatigue, as well as anxiety, depression, memory loss, or suicidal ideation. (Tr. at 829.) A neurologic examination revealed that Claimant was alert and oriented with no impairment in recent or remote memory, and that her attention span and ability to concentrate were normal. (Tr. at 830.)

On July 27, 2015, Claimant presented to Dr. Schwartz. (Tr. at 765-770.) It was noted that she was doing better on very low doses of prednisone, however, her major complaint was orthostatic hypotension and fatigue. (Tr. at 765.) She reported that she sleeps well "but feels over-medicated on the Seroquel and want [to] stop it." (Id.) Claimant denied anxiety, depression, memory loss, or suicidal ideation. (Tr. at 768.) "A lot of ecchymosis" was noted with her general appearance. (Id.)

On July 29, 2015, Ms. Reed saw Claimant for follow-up care, at which time she denied medication-related side effects, and symptoms of depression, mania, or psychosis. (Tr. at 760.)

On August 25, 2015, Dr. Milhoan saw Claimant for a pre-op visit prior to bunion repair surgery (Tr. at 819.), at which time Claimant denied fatigue or tiredness. (Tr. at 822.) She also

denied anxiety, depression, memory loss, or suicidal ideation. (Id.) A neurologic examination revealed that Claimant was alert and oriented with no impairment of recent or remote memory, and that her attention span and ability to concentrate were normal. (Tr. at 824.)

On October 21, 2015, Claimant returned to see Ms. Reed for a follow up visit and reported that she was working on quilts for her family members and denied any medication changes or medication-related side effects. (Tr. at 762.) She indicated that she preferred to stay by herself and that she had a friend she sews with; she also reported interest in starting exercise, "which is encouraged." (Id.)

Opinion Evidence:

On October 17, 2013, Nisha Singh, M.D., a state agency physician, performed a physical residual functional capacity assessment based on her review of the record. (Tr. at 70-72.) Dr. Singh found that Claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of 4 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and that her ability to push and/or pull was unlimited except as shown for lifting and/or carrying. (Tr. at 70-71.) Dr. Singh also opined that Claimant would need to avoid concentrated exposure to extreme heat and cold. (Tr. at 71.)

On November 7, 2013, Frank Roman, Ed.D., a State agency psychologist, completed a Psychiatric Review Technique form. (Tr. at 68-69.) Dr. Roman found that Claimant had medically determinable impairments of depression and anxiety, though both were not "severe" as they resulted in mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration persistence, or pace, and no repeated episodes of decompensation, each of extended duration. (Tr. at 69.) Dr. Roman noted that Claimant

had a drug-induced reaction that had now resolved. (Id.) Dr. Roman also noted that Claimant was independent in activities of daily living, and that her mental status was currently within normal limits. (Id.)

On March 5, 2014, Dr. Milhoan noted that Claimant was taking Seroquel, which was very sedating, and he concluded "she truly is disabled." (Tr. at 638.)

On April 18, 2014, Saima Noon, M.D., a State agency physician, performed a physical residual functional capacity assessment based on her review of the updated record. (Tr. at 87-89.) Dr. Noon agreed with Dr. Singh's prior findings in all respects, but found that Claimant would also need to avoid concentrated exposure to vibration and hazards such as machinery and heights. (Tr. at 70-71, 87-89.)

**The Administrative Hearing**

<u>Claimant Testimony:</u>

Claimant testified that she had not worked since 2013 when she retired from employment with the State of West Virginia. (Tr. at 49-50.) She explained that she did not get "medically retired by the State", but she missed three months of work because of her Addison's disease and side effects from steroids that caused her to see and hear things. (Tr. at 50.) She did not get clearance to return to work after three months so she decided to leave her position and felt it was best for her health. (Id.)

Claimant testified that her diabetes insipidus causes extreme thirst, and that she has to monitor her liquid intake and empty her bladder every hour. (Tr. at 51.) She stated that for her Addison's disease, she must take steroids and that she had two previous episodes of steroid-induced psychosis, and although Seroquel helped with hallucinations and insomnia, she

18

experienced significant fatigue. (Id.) She explained that she has trouble getting up on Sunday mornings to go to church and she did not believe she could get ready and go out to a job every day from a physical standpoint. (Id.) She is glad just to get out of bed every day. (Id.) She said that some days her fatigue would cause her to miss four or five days a month. (Tr. at 52.) Other days she has more energy to do the laundry or vacuum. (Id.) She also testified that she drove short distances when she knew she was okay. (Id.)

Claimant described seizure-like movements, dizziness, and an imbalanced feeling when changing positions from sitting to standing as a result of her Addison's disease. (Id.) She stated she had chronic back pain from the waist down to her toes if she stands too long. (Tr. at 51-52.) She testified that she took frequent breaks for about 15 minutes each when doing household chores. (Tr. at 53.) She stated she had difficulty with concentration and could no longer read a long book, but she can read short stories or short articles in a magazine. (Id.) She stated that after baking cookies with a friend, she was exhausted and her legs were throbbing the next day. (Tr. at 54.) Claimant testified that she took at least one nap per day, about 45 minutes, and on "bad days", she would sleep most of the day. (Id.)

Claimant testified that she "spent a major part of my thinking life trying to combat depression" and that she has been taking medication since 1991. (Tr. at 55.) She stated that her depression had worsened when she was working because she was stressed and could not keep up with her job. (Id.) She then explained that her depression had not improved since she had stopped working and that she did not know and never understood why she was depressed. (Id.) She testified that she noticed that since she has been on Seroquel, she felt numb and not like herself. (Id.)

<u>Cecelia Thomas, Vocational Expert ("VE") Testimony:</u>

19

The VE testified that Claimant's past work had been primarily as an employee relations representative (DOT No. 166.257-010) at the skilled, light level and as a human resources administrator (DOT No. 166.167-018) and Medicaid eligibility worker (DOT No. 195.267-010) at the skilled, sedentary level. (Tr. at 57.) She stated Claimant had developed skills in program administration and assessment and human resources in these jobs. (Tr. at 58.)

The ALJ asked the VE to consider a hypothetical individual with Claimant's vocational profile and RFC. (Id.) The VE testified that the individual could perform Claimant's past work as a human resource administrator. (Id.) The VE responded that the individual would be unable to perform any of Farris's past work if she were also limited to work requiring no more than occasional decision making or changes in the work setting. (Id.) The VE elaborated that these restrictions would limit an individual to unskilled work. (Id.) The VE also testified that four to five absences per month would preclude work. (Tr. at 59.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As previously stated, Claimant argues the ALJ did not adhere to the special deference standard that is afforded to the opinions of treating sources, namely, Dr. Milhoan. (Document No. 12 at 5-10.)

The Evaluation of Opinion Evidence:

The Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 404.1527(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(c)(2).

As an initial matter, the undersigned agrees with Claimant that the ALJ did not explicitly assign weight to the relevant medical evidence provided by Dr. Milhoan. The ALJ discussed Dr. Milhoan's opinion evidence at length, including his treatment records, noting he was Claimant's treating physician, and ultimately decided Dr. Milhoan's opinions regarding the "sedating factor of Seroquel would result in mental deficits" and that Claimant was disabled, were "conclusory in nature" without adequate explanation or specific functional limitation findings. (Tr. at 33-34.) Nevertheless, a court cannot determine if an adjudicator's "findings are unsupported by substantial evidence unless the [Commissioner] explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235-236 (4th Cir. 1984) (citing Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980); Stawls v. Califano, 596 F.2d 1209, 1213 (4th Cir. 1979); Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977)). Indeed, the Fourth Circuit held

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Id. at 236 (quoting Arnold, 567 F.2d at 259.)

Of further importance here is that the ALJ acknowledged the medical records documented Claimant's use of Seroquel controlled her hallucinations caused by her steroid medication, but it also caused her fatigue. (Tr. at 30, 31, 33, 34.) The ALJ also acknowledged Claimant's testimony that she experienced fatigue as a side effect of Seroquel, and that it made it difficult for her to concentrate. (Tr. at 27.) Even though the ALJ discussed the conflicting evidence of record concerning the degree of fatigue Claimant experienced from using Seroquel[3] (Tr. at 27, 31, 32.), the fact remains that the ALJ expressly questioned Dr. Milhoan's "conclusory" opinion as to how Claimant's functional limitations might be affected by this medication, and how it might preclude her performance at her prior level of work. (Tr. at 34.) The RFC assessment does not include any potential limitation caused by Seroquel's sedation effect, save for reducing Claimant to sedentary work. Moreover, no other opinion evidence of record specifically addresses this side effect. (Tr. at 33.) Therefore, remand is appropriate under these circumstances because the ALJ's failure to expressly assign weight to Dr. Milhoan's opinion is not harmless error. But cf., Tanner v. Commissioner of Social Sec., 602 Fed. App'x. 95, 100-101 (4th Cir. 2015).

To the extent that Dr. Milhoan opined that Claimant was disabled, clearly such a determination is reserved to the Commissioner, and the ALJ had no duty to give it any special significance. 20 C.F.R. § 404.1527(d)(3). Nevertheless, the treating source opinion evidence related to Claimant's fatigue due to Seroquel was entitled to special deference treatment, and the

---

[3] The undersigned notes that the Commissioner references many of the medical records in her brief, but she inaccurately referenced that "[o]n June 30, 2014, [Claimant] complained of fatigue (Tr. 644), but reported that she was walking 4-7 times a week, bicycling, and lifting weights 1-3 times a week (Tr. 643)." (Document No. 13 at 16.) That medical record actually noted: ***"07/09/2013: in the past Exercise Walks 4-7 times a week. Bicycling and weights 1-3 times per week"*** (Tr. at 642.) (emphasis supplied). There were numerous other references that contained earlier dated notations that did not reflect what was actually discussed during the current treatment session; to the undersigned, this notation indicated that Claimant had previously exercised as of July 9, 2013, but was not exercising as of June 30, 2014.

ALJ had an obligation to provide this Court with the proper evaluation and explanation for the weight given in order for this Court to engage in meaningful review. Newhart v. Colvin, No. 6:16-cv-01606, 2014 WL 1330929 (S.D. W. Va. Mar. 31, 2014).

Accordingly, the undersigned **FINDS** that the ALJ's evaluation of Dr. Milhoan's opinion to the extent it concerned his patient's fatigue due to Seroquel for the ongoing treatment of her severe physical impairment is not based upon substantial evidence.[4]

The Consideration of Non-Severe Impairments:

With regard to Claimant's next assignment of error, that the ALJ failed to consider the effects of her non-severe mental impairments at step two, specifically, depression and anxiety, there is no dispute that the ALJ mentioned neither of these diagnoses at that step. (Document No. 12 at 10-12.) When an adjudicator fails to list an additional impairment as severe at step two, it is not reversible error if the adjudicator finds at least one other severe impairment and continues with the remaining steps in the sequential evaluation process. Ashby v. Colvin, 2015 WL 1481625, at *9 (S.D.W. Va. Mar. 31, 2015). However, it is clear that the ALJ considered these impairments in the subsequent steps in the sequential evaluation process.

The ALJ performed the "special technique" pursuant to Section 404.1520a, finding that Claimant had mild limitations in activities of daily living and concentration, persistence, or pace; the ALJ found no limitation in her social functioning and no episodes of decompensation, which have been of extended duration. (Tr. at 27.) These findings were supported by the opinions provided

---

[4] To the extent that Claimant argues that the ALJ should have sought additional information from Dr. Milhoan to clarify his opinion, the undersigned declines to address this issue, as the ALJ has discretion to take such action under 20 C.F.R. § 404.1520b if he deems it necessary. However, the failure to expressly assign weight to a treating source opinion was reversible error in this case, as the ALJ was required to evaluate this opinion, and provide an explanation for the weight he would have given Dr. Milhoan's opinion if he determining controlling weight was in appropriate per Section 404.1527(c).

by the State agency psychological consultants; they also opined Claimant's "psychiatric impairments were nonsevere." (Tr. at 28.) Additionally, at step three, the ALJ considered Claimant's mental impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1 and determining that they did not meet or equal the severity listings for "mood disorders under 12.00." (Tr. at 28-29.)

In assessing her RFC, the ALJ specifically noted that Claimant's mental impairments were not severe; following her September 2008 hospitalization for steroid induced mania, upon discharge "her memory was grossly intact, she exhibited a good fund of knowledge, her attention and concentration were adequate and insight and judgment fair." (Tr. at 30.) The ALJ next considered Claimant's primary care provider's May 2013 referral for a psychiatric consultation based on this history, where Claimant "reported no significant mental health limitations at that time." (Id.)

The ALJ also considered the Westbrook Health Services mental health treatment records from July 2013 through September 2013 that "consistently identified the claimant's mental status within normal limits." (Id.) The ALJ explicitly noted that the progress notes dated September 17, 2013 indicated Claimant "felt 'normal,' and denied 'depressive symptoms.' " (Id.) Next, the ALJ noted February 2014 mental health records showed Claimant "again denied feelings of depression or anxiety"; July 2015 mental health records indicated Claimant's mood was stable, "and she denied symptoms of depression, mania or psychosis." (Id.) Mental health records dated October 2015 showed that although Claimant endorsed "some increased feelings of anxiety, mental status examination remained unremarkable with mood euthymic, insight and judgment good." (Id.)

The ALJ also reviewed the progress notes from Claimant's primary care physician that "routinely show normal mental status assessments." (Tr. at 30-31.) The ALJ's review of the mental

health treatment evidence, including the opinion evidence related to Claimant's mental impairments, demonstrated that he considered any limitations Claimant may have had due to her non-exertional impairments, therefore, remand on this issue is unnecessary.

Ultimately, despite that the "mental health treatment has been rather sparse", the ALJ found that "the objective and clinical findings do not support any significant ongoing mental health limitations." (Tr. at 30.) As the ALJ determined from the medical evidence of record, which remained consistent and sufficient for purposes of his review, the undersigned finds no error when he exercised his discretion by not ordering a psychiatric consultative examination.[5] (Tr. at 31.) In sum, the undersigned further agrees with the Commissioner that the evidence concerning Claimant's other alleged mental impairments were not severe pursuant to the Regulations, and that at this step in the sequential evaluation process, Claimant did not carry her burden in proving that they significantly limited her ability to do basic work activities. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1512(c).

Accordingly, the undersigned **FINDS** that the ALJ's step two assessment in finding Claimant's mental impairments, depression and anxiety, are not severe is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for judgment on the pleadings (Document No. 12.) to the extent

---

[5] 20 C.F.R. § 404.1520b(a) provides: "If all of the evidence we receive, including all medical opinion(s), is consistent and there is sufficient evidence for us to determine whether you are disabled, we will make our determination or decision based on that evidence."

that this matter be remanded back to the Commissioner, **DENY** the Defendant's request to affirm the ALJ's decision (Document No. 13.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order for the ALJ to properly evaluate Dr. Milhoan's opinion only with regard to his assessment of Claimant's fatigue as caused by her Seroquel prescription.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of

such objections shall be served on opposing parties, District Judge Goodwin, and this Magistrate

Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and

to send a copy of same to counsel of record.

ENTER: October 23, 2017.


Omar J. Aboulhosn
United States Magistrate Judge